## James G. Fitl, appellee, v. Mark Strek, doing business as Star Cards of San Francisco, appellant.

690 N.W.2d 605

Filed January 7, 2005.   No. S-03-836.

Joel M. Carney and James J. Bemis, Jr., of Walentine, O'Toole, McQuillan & Gordon, for appellant.

Patrick M. Heng, of Raynor, Rensch & Pfeiffer, for appellee.

Hendry, C.J., Wright, Connolly, Gerrard, Stephan, McCormack, and Miller-Lerman, JJ.

Wright, J.

### NATURE OF CASE

James G. Fitl purchased a baseball card from Mark Strek, doing business as Star Cards of San Francisco. When Fitl discovered that the baseball card had been altered and was of no value, he sued Strek for what he argued was the current fair market value of an unaltered version of the same card. Following a bench trial, judgment was entered against Strek in the amount of $17,750 plus costs. Strek appeals.

### SCOPE OF REVIEW

In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. *Webb v. American Employers Group*, 268 Neb. 473, 684 N.W.2d 33 (2004).

## FACTS

In September 1995, Fitl attended a sports card show in San Francisco, California, where Strek was an exhibitor. Fitl subsequently purchased from Strek a 1952 Mickey Mantle Topps baseball card for $17,750. According to Fitl, Strek represented that the card was in near mint condition. After Strek delivered the card to Fitl in Omaha, Nebraska, Fitl placed it in a safe-deposit box.

In May 1997, Fitl sent the baseball card to Professional Sports Authenticators (PSA), a grading service for sports cards that is located in Newport Beach, California. PSA reported to Fitl that the baseball card was ungradable because it had been discolored and doctored.

On May 29, 1997, Fitl wrote to Strek and indicated that he planned to pursue "legal methods" to resolve the matter. Strek replied that Fitl should have initiated a return of the baseball card in a timely fashion so that Strek could have confronted his source and remedied the situation. Strek asserted that a typical grace period for the unconditional return of a card was from 7 days to 1 month.

In August 1997, Fitl sent the baseball card to ASA Accugrade, Inc. (ASA), in Longwood, Florida, for a second opinion. ASA also concluded that the baseball card had been refinished and trimmed.

On September 8, 1997, Fitl sued Strek, alleging that Strek knew the baseball card had been recolored or otherwise altered and had concealed this fact from him. Fitl claimed he had reasonably relied upon Strek's status as a reputable sports card dealer. Strek's answer generally denied Fitl's allegations.

In a trial to the court, Fitl appeared with counsel and offered evidence. Strek was represented by counsel but did not appear or offer any evidence. Fitl testified that he was in San Francisco over the Labor Day weekend of 1995, where he met Strek at a sports card show. Fitl subsequently purchased from Strek a 1952 Mickey Mantle Topps baseball card and placed it in a safe-deposit box. In 1997, Fitl retrieved the baseball card and sent it to PSA, a sports card grading service.

Steve Orand testified that he had been a sports card collector for 27 years and that he bought, sold, and traded cards. He testified that PSA originated in 1996 or 1997 and was a leader in the sports card grading industry. He stated that PSA would not grade

an altered card because alteration would totally devalue the card. He opined that any touchup or trimming of a card would render the card valueless and that an altered card is worth no more than the paper on which it is printed.

Orand examined the baseball card in question the week before trial and said that the edges of the card had been trimmed and reglued. One spot on the front of the baseball card and a larger spot on the back had been repainted, which left the card with no value. He testified that the standard for sports memorabilia was a lifetime guarantee and that a reputable collector would stand behind what he sold and refund the money if an item were fake or had been altered.

The district court entered judgment for Fitl in the amount of $17,750 and costs. The court found that Fitl had notified Strek as soon as he realized the baseball card was altered and worthless and that Fitl had notified Strek of the defect within a reasonable time after its discovery. The court rejected Strek's theory that Fitl should have determined the authenticity of the baseball card immediately after it had been purchased.

## ASSIGNMENT OF ERROR

Strek claims that the district court erred in determining that notification of the defective condition of the baseball card 2 years after the date of purchase was timely pursuant to Neb. U.C.C. § 2-607(3)(a) (Reissue 2001).

## ANALYSIS

In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. *Webb v. American Employers Group*, 268 Neb. 473, 684 N.W.2d 33 (2004). The district court found that Fitl had notified Strek within a reasonable time after discovery of the breach. Therefore, our review is whether the district court's finding as to the reasonableness of the notice was clearly erroneous.

Section 2-607(3)(a) states: "Where a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]" "What is a reasonable time for

taking any action depends on the nature, purpose and circumstances of such action." Neb. U.C.C. § 1-204(2) (Reissue 2001).

The notice requirement set forth in § 2-607(3)(a) serves three purposes. It provides the seller with an opportunity to correct any defect, to prepare for negotiation and litigation, and to protect itself against stale claims asserted after it is too late for the seller to investigate them. See *Cheyenne Mountain Bank v. Whetstone Corp.*, 787 P.2d 210 (Colo. App. 1990). "Whether the notice given is satisfactory and whether it is given within a reasonable time are generally questions of fact to be measured by all the circumstances of the case." *Id.* at 213.

In *Maybank v. Kresge Co.*, 302 N.C. 129, 273 S.E.2d 681 (1981), the court reviewed the policies behind the notice requirement. The most important one is to enable the seller "to make efforts to cure the breach by making adjustments or replacements in order to minimize the buyer's damages and the seller's liability." *Id.* at 134, 273 S.E.2d at 684. A second policy is to provide the seller "a reasonable opportunity to learn the facts so that he may adequately prepare for negotiation and defend himself in a suit." *Id.* A third policy, designated the "least compelling" by the court, is the same as the policy behind statutes of limitation: "to provide a seller with a terminal point in time for liability." *Id.* at 135, 273 S.E.2d at 684.

Fitl purchased the baseball card in 1995 and immediately placed it in a safe-deposit box. Two years later, he retrieved the baseball card, had it appraised, and learned that it was of no value. Fitl testified that he had relied on Strek's position as a dealer of sports cards and on his representations that the baseball card was authentic. In *Cao v. Nguyen*, 258 Neb. 1027, 607 N.W.2d 528 (2000), we stated that a party is justified in relying upon a representation made to the party as a positive statement of fact when an investigation would be required to ascertain its falsity. In order for Fitl to have determined that the baseball card had been altered, he would have been required to conduct an investigation. We find that he was not required to do so. Once Fitl learned that the baseball card had been altered, he gave notice to Strek.

As the court noted in *Maybank v. Kresge Co., supra*, one of the most important policies behind the notice requirement of North Carolina's equivalent to § 2-607(3)(a) is to allow the seller to cure

the breach by making adjustments or replacements to minimize the buyer's damages and the seller's liability. However, even if Fitl had learned immediately upon taking possession of the baseball card that it was not authentic and had notified Strek at that time, there is no evidence that Strek could have made any adjustment or taken any action that would have minimized his liability. In its altered condition, the baseball card was worthless.

Strek claimed via his correspondence to Fitl that if Strek had received notice earlier, he could have contacted the person who sold him the baseball card to determine the source of the alteration, but there is no evidence to support this allegation. In fact, Strek offered no evidence at trial. His letter is merely an assertion that is unsupported. Earlier notification would not have helped Strek prepare for negotiation or defend himself in a suit because the damage to Fitl could not be repaired. Thus, the policies behind the notice requirement, to allow the seller to correct a defect, to prepare for negotiation and litigation, and to protect against stale claims at a time beyond which an investigation can be completed, were not unfairly prejudiced by the lack of an earlier notice to Strek. Any problem Strek may have had with the party from whom he obtained the baseball card was a separate matter from his transaction with Fitl, and an investigation into the source of the altered card would not have minimized Fitl's damages.

Strek represented himself as a sports card dealer at a card show in San Francisco. After Fitl expressed interest in a specific baseball card, Strek contacted Fitl to sell him just such a card. Orand stated that a reputable dealer will stand behind what he sells and refund the money if an item is fake or has been altered. In the context of whether a rejection of goods was made in a reasonable amount of time, we have stated that "when there is no precise rule of law which governs, the question of what, under the circumstances of a particular case, is a reasonable amount of time is usually a question for the jury." See *Smith v. Paoli Popcorn Co.*, 255 Neb. 910, 917, 587 N.W.2d 660, 664 (1999).

The district court found that it was reasonable to give Strek notice of a defect 2 years after the purchase. This finding was not clearly erroneous. Pursuant to § 2-607(4), the burden is on the buyer to show a breach with respect to the goods accepted. Fitl presented evidence that the baseball card was not authentic, as he

had been led to believe by Strek's representations. Strek did not refute Fitl's evidence.

## CONCLUSION

The judgment of the district court is affirmed.

AFFIRMED.